In re MOLTEN METAL TECHNOLO-GY, INC., MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc., M4 Environmental L.P., Debtors.

Bankruptcy Nos. 97–21385–CJK, 97–21386–CJK, 97–21387–CJK, 97–21388–CJK, 97–21389–CJK.

United States Bankruptcy Court,
D. Massachusetts.

Jan. 28, 2000.

Charles R. Dougherty, Boston, MA, for employees.

Steven T. Hoort, for MMT Recovery LLC.

Steven Gray, Chapter 11 Trustee.

Alan L. Braunstein, Boston, MA, for Chapter 11 Trustee.

Mark N. Berman, Boston, MA, for Fluor Daniel, Inc.

Daniel Glosband, Boston, MA, for Creditors Committee United States Trustee.

### MEMORANDUM OF DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT BY MMT RECOVERY LLC REGARDING MOTION OF CERTAIN FORMER EMPLOYEES OF DEBTORS FOR PAYMENT ON A PRIORITY BASIS OF ADMINISTRATIVE EXPENSES AND ON FORMER EMPLOYEES' CROSS–MOTION FOR SUMMARY JUDGMENT

CAROL J. KENNER, Bankruptcy Judge.

Eleven former employees (the "Employees") [1] of the Debtors in these jointly-administered cases have jointly moved for immediate payment, from the proceeds of the Debtors' asset sales, of their administrative claims, totaling $595,104.37, for severance payments promised them by the Debtors under postpetition employee-retention agreements. Except to the extent that the proceeds are subject to disputed senior liens aggregating less than $2 million, the proceeds at issue—$15.5 million (including $5 million of receivables), all from sale of the Debtors' two principal businesses—are fully encumbered by a security interest in favor of MMT Recovery LLC ("the Lender"), the successor in interest to the Debtors' postpetition lenders.[2] In relevant part, the Employees contend that, under § 506(c) of the Bankruptcy Code, they should recover their severance claims from the proceeds that constitute the Lender's collateral as reasonable, necessary costs of preserving the value of the assets whose sale yielded the proceeds.[3] The Lender opposes the § 506(c) claim and now has moved for summary judgment on it, as well as on the specific administrative claim of Employee Charles Shaver for $250,000. The Employees oppose the motion for summary judgment and have filed a cross-motion for summary judgment. For the reasons set forth below, the Court will deny the Employees' cross-motion, allow the Lender's motion for summary judgment as to the Employees' claims under § 506(c) and as to the administrative claim of Charles Shaver.

### PROCEDURAL HISTORY

On January 25, 1999, the Employees filed their Motion for Payment on Pri-

---

1. The eleven Employees and the amounts of their claims are H.W. Arrowsmith ($69,230.77), Steven M. Brien ($26,953.74), David L. Hoey ($28,061.39), James Howie ($15,360.00), Donald E. Keck ($50,769.23), William J. McGowan ($33,498.47), Samuel Pelchar ($33,230.77), Rick Penpek ($30,769.23), Charles Shaver ($250,000.00), Garry J. Strand ($18,461.54), and Mark A. Wilkinson ($38,769.23)

2. The security interest secures a claim in the principal amount of approximately $20 million, plus substantial interest and attorneys' fees.

3. In the alternative, the Employees seeks priority over the Debtors' other administrative creditors. The present motion for summary judgment concerns only the Employees' claim under § 506(c).

ority Basis of Administrative Expenses. The Motion seeks immediate payment of the Employees' severance claims on either of two bases: (i) as an administrative expense under 11 U.S.C. § 503 that, pursuant to 11 U.S.C. § 105(a), the Court should elevate to extra-statutory priority over all other administrative claims, including the "superpriority" administrative claim given earlier in this case to the Lender pursuant to 11 U.S.C. § 364(c)(1); or (ii) as a charge against the Lender's collateral under 11 U.S.C. § 506(c). The Motion drew objections from the Lender, the Chapter 11 Trustee, the Official Committee of Unsecured Creditors, and Fluor Daniel, Inc. (as the holder of a large administrative claim in this case). As the holder of an administrative claim having priority over all other administrative claims in this case, the Lender objects to the motion insofar as it seeks priority over its own administrative claim; and, as the holder of a lien on the proceeds at issue, the Lender objects to the Employees' motion insofar as it seeks payment out of the proceeds securing the Lender's claim. Because the § 506(c) portion of the Lender's objection derives from concerns unique to itself, and because the Lender argued, correctly, in its initial response to the motion that, insofar as the motion sought relief under § 506(c), the § 506(c) claim should have been brought in an adversary proceeding, the Court entered a Procedural Order permitting the Lender to file a motion for summary judgment as to the § 506(c) portion of the motion,[4] contemplating that if the motion were allowed, the need for a complex adversary proceeding would be obviated.

The Lender has now moved for summary judgment, seeking judgment as to the § 506(c) portion of the Employees' motion and as to the administrative claim of Employee Charles Shaver. The Employees oppose the motion and have filed a cross-motion for summary judgment. The

Lender opposes the cross-motion and has also moved to strike it on several grounds, including that the Employees cannot obtain relief under § 506(c) without an adversary proceeding; the Employees oppose the motion to strike. The Lender has also moved to strike (i) portions of the Employees' affidavits and exhibits and (ii) the Employees statement of disputed facts, all submitted in support of the Employees' opposition and cross-motion for summary judgment. The Employees oppose this motion and, in response to the motion to strike, have moved to amend certain of their admissions of facts. The Lender opposes the motion to amend.

## CROSS–MOTION FOR SUMMARY JUDGMENT

The Lenders have moved to strike the Employees' Cross–Motion for Summary Judgment on the basis that, as reflected in the Court's procedural order on the Motion for Payment on Priority Basis of Administrative Expenses, the relief sought by the Employees against the Lender under § 506(c) of the Bankruptcy Code requires, and cannot be obtained outside of, an adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure (F.R.Bankr.P. 7001 *et seq.*). The Court agrees. In relevant part, F.R.Bankr.P. 7001 states that "[a]n adversary proceeding is governed by the rules of this Part VII. It is a proceeding ... (2) to determine the validity, priority, or extent of a lien or other interest in property." The § 506(c) portion of the Employees' Motion for Payment on Priority Basis of Administrative Expenses seeks, in essence, to give the Employees' severance claims priority over the Lender's lien. Therefore, the motion is a proceeding to determine the priority of a lien and, as such, must satisfy the rules of Part VII. The Court cannot grant this relief outside of an adversary proceeding.

---

**4.** The Procedural Order further stated that if no motion for summary judgment were filed or the motion for summary judgment were filed and denied, then the Employees would

be obligated to refile the § 506(c) portion of their motion as an adversary complaint, failing which that portion of the motion would be denied with prejudice.

In addition, the relief that the Employees seek—priority over the Lender's secured and administrative claims—concerns not only the Lenders but also the Trustee and all other administrative claimants: a claim having priority over the Lender's claim will necessarily also have priority over the estate and all other administrative claimants. The Trustee and objecting administrative creditors must be heard, but the mechanism of a cross-motion for summary judgment, which by definition seeks relief only against the proponent of the original motion for summary judgment, would improperly deny other parties in interest an opportunity to defend their interests. And, in fact, the Employees' certificate of service with respect to their cross-motion shows no service on any entity other than Lender's counsel. For these reasons, the Court will deny the cross-motion for summary judgment and allow the Lender's motion to strike it.

## LENDER'S MOTION FOR SUMMARY JUDGMENT

### a. *Standard of Review*

The Court may allow a motion for summary judgment only when there are no genuine issues of material fact and, on the uncontroverted material facts, the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(c), made applicable in this contested matter by F.R.Bankr.P. 9014 and 7056; *In re Varrasso*, 37 F.3d 760, 763 (1st Cir.1994). Where the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence—in the form of affidavits, admissions, depositions, answers to interrogatories, and the like—as to each essential element of its cause of action. The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict under F.R.Civ.P. 50(a). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the motion is properly supported, the burden shifts to the adverse party to submit evidence demonstrating the existence of a genuine issue

as to at least one material fact. "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." F.R.Civ.P. 56(e).

Where the moving party would not bear the burden of proof at trial, the movant's initial burden is to demonstrate or point out a lack of evidence to support at least one essential element of the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to adduce such evidence on each of the disputed elements as at trial would be sufficient to withstand a motion for directed verdict. *Anderson v. Liberty Lobby, Inc., supra.* Summary judgment will enter for the movant if the party bearing the burden of proof fails to establish the existence of an element essential to its case. *Celotex Corp. v. Catrett*, 477 U.S. at 322–323, 106 S.Ct. 2548; *In re Varrasso*, 37 F.3d 760, 763 n. 1 (1st Cir.1994).

In this instance, the Employees would bear the burden of proving at trial that they have a claim against the Lender's collateral under § 506(c) or, in the alternative, that they have an administrative claim that is entitled to priority over the Lender's own superpriority administrative claim. The Lender bears the burden of proof on its affirmative defense that the § 506(c) claim has been waived.

### b. *Claim Under § 506(c)*

In relevant part, the Employees contend that, under § 506(c) of the Bankruptcy Code, they should recover their severance claims from the proceeds that constitute the Lender's collateral as reasonable, necessary costs of preserving the value of the assets whose sale yielded the proceeds. The proceeds derive from the postpetition sale of the Debtors' two principal businesses. The Employees contend that their services were indispensable in preserving the value of these businesses, and that the promised severance benefits were a rea-

sonable cost of obtaining those services; moreover, they contend, the Lender consented to the severance benefits. Relying on *In re Parque Forestal, Inc.,* 949 F.2d 504, 511–512 (1st Cir.1991), the Employees also argue that, where the Debtors–in–Possession and Chapter 11 Trustee have waived their right to assert 506(c) claims for these benefits, the Employees have standing to bring such claims themselves.

The Lender seeks summary judgment on the Employees' claims under § 506(c) on numerous grounds, including that the Trustee has waived the claims that the Employees now assert. Specifically, the Lender argues that the authority to bring a claim under § 506(c) of the Bankruptcy Code belongs in the first instance to the trustee or debtor-in-possession; that insofar as other entities have standing to assert claims under § 506(c), their standing is derived from the trustee's and not independent of it; that the Debtors–in–Possession and the Chapter 11 Trustee in these cases have waived and released all claims against the Lenders, expressly including claims under § 506(c) of the Bankruptcy Code; and that this waiver is binding and effective against the Employees because their standing derives from the Trustee's. The Employees argue that the waiver is ineffective against them on three grounds: that any waiver of a claim under § 506(c) is unenforceable on public policy grounds; that the Employees were not parties to the agreement in which the Trustee waived his § 506(c) claims; and that the interim order approving the agreement limits the waiver to "the Debtor or any trustee or estate representative." For the reasons set forth below, the Court finds that there are no genuine issues of material fact on the waiver defense and that, on the uncontroverted facts, the Lender is entitled to judgment as a matter of law on this defense and therefore on the Employees' claims under § 506(c).

### 1. *Facts*

There are no genuine issues of material fact with respect to the waiver defense. The uncontroverted facts are as follows. On December 3, 1997, the above-captioned Debtors, who were in the business of developing and using innovative technologies for recycling and disposing of low-level radioactive and hazardous waste, filed petitions under Chapter 11 of the Bankruptcy Code. Their cases have been jointly administered (but not substantively consolidated). After the filing of the petition, the Lender's predecessor in interest (hereinafter, "the Lender") agreed to provide the Debtors $7 million of debtor-in-possession financing on an interim basis and then up to an additional $13 million of medium-term financing. The Court approved these agreements with three orders: the Interim Order Authorizing Debtors to Enter into Postpetition Financing Agreement, entered December 18, 1997 ("Interim Short Term Financing Order"); the Final Order Authorizing Debtors to Enter into Postpetition Financing Agreement, entered January 6, 1998 ("Final Short Term Financing Order"); and the Final Order Granting Superpriority and Liens and Authorizing Debtors to Enter into Postpetition Financing Agreement, entered March 6, 1998 ("Medium Term Financing Order").

The Short and Medium Term Financing Orders provided that, to secure payment of the Debtors' obligations under the financing agreements, the Lenders would receive first priority liens on substantially all of the Debtors' assets, subject only to existing valid liens.[5] Each order also expressly provided that

> [a]ny right of the Debtors or any trustee or estate representative on behalf of the Debtors' estates now existing or hereafter arising to any recovery against Lenders or from property securing the Obligations under Section 506(c) of the

---

5. Interim Short Term Financing Order, ¶ 10 at 5; Final Short Term Financing Order, ¶ 10 at 6; and Medium Term Financing Order, ¶ 12 at 9.

Bankruptcy Code is prohibited and shall be forever barred.[6]

Pursuant to § 364(c)(1), the orders also provided that the Debtors' loan obligations would constitute superpriority administrative claims that would have priority over all other administrative claims, expressly including administrative claims under §§ 503(b), 506(c), and 507(b) of the Bankruptcy Code.[7] The Lenders advanced loans to the Debtors through August 1998 in reliance on the Short and Medium Term Financing Orders.

However, in August, 1998, when the Lender came to believe that the Debtors' cost projections were unreliable and that the Debtors could not successfully reorganize within the financial parameters created by the financing agreements, the Lender filed a motion for appointment of a Chapter 11 Trustee. On August 21, 1998, the Court directed the appointment of a Chapter 11 Trustee, and, on August 24, 1998, the Court allowed the United States Trustee's application to approve the appointment of Stephen Gray as Chapter 11 Trustee in these five cases.

The Chapter 11 Trustee then negotiated a further agreement (the "OverAdvance Agreement") with the Lender for additional loan advances of up to $3.5 million to finance the orderly liquidation of the Debtors' estates. The Court approved the OverAdvance Agreement in an interim order of September 29, 1998 ("Interim OverAdvance Order") and a final order of October 13, 1998 ("Final OverAdvance Order"). The Final OverAdvance Order modified the provisions of the Short and Medium Term Financing Orders insofar as they related to claims under § 506(c) as follows:

> Section 15 of the Court's March 6, 1998 Final Order prohibits any recovery against any of the Lenders (and under Section 24 New Lender as successor thereof) or from property securing the Obligations under Section 506(c) of the Bankruptcy Code (the " § 506(c) Waiver"). In this Court's Interim Order Granting Second Motion of the Chapter 11 Trustee to Approve Amendment to Post–Petition Financing Agreement Dated as of March 3, 1998 entered on September 29, 1998 (the "Interim Order"), the Court ruled that it would not grant the § 506(c) Waiver prospectively but that its ruling would have prospective application only. Accordingly, other than and excepting any cost or expense incurred, liability in existence, or claim under section § 506(c) which had arisen prior to entry of the Interim Order, any claim against property securing the Obligations to new Lender under Section 506(c) of the Bankruptcy Code for reasonable and necessary costs and expenses incurred to the extent of any benefit to New Lender will not be waived by reason of the prior sec. 506(c) waiver.

Final OverAdvance Order, § 6 at 4–5.

Because it appeared that the estate, when liquidated, might not generate sufficient funds to pay the Lender in full, or might generate insufficient excess proceeds (after payment of all secured claims) to pay the fees of the Chapter 11 Trustee and his professionals and the substantial administrative expenses that had accrued during the case, the approved OverAdvance Agreement also provided for specific carve-outs from the Lender's lien for the Chapter 11 Trustee and his counsel, for the transition fees and expenses of counsel to the Debtors and to the Creditors' Committee, and for allowed administrative expenses (other than the administrative expense owed to the Lender). As a result of these carve-outs and of an additional carve-out created in the Short and Medium Term Financing Orders for the fees and expenses of Chapter 11 professionals, the

---

6. Interim Short Term Financing Order, ¶ 12 at 7; Final Short Term Financing Order, ¶ 12 at 9; and Medium Term Financing Order, ¶ 15 at 13.

7. Interim Short Term Financing Order, ¶¶ 11 and 13; Final Short Term Financing Order, ¶¶ 11 and 13; and Medium Term Financing Order, ¶¶ 13 and 16.

proceeds of assets and other recoveries in these cases will be distributed in the following order of priority:

- First, the approved fees and expenses of any auctioneer or liquidator for any asset sale shall be paid from the proceeds of such sale. OverAdvance Agreement, § 4.5.1, item First at 14.

- Second, creditors having liens senior to the Lender's will be paid from the proceeds of their collateral to the extent of their valid liens. OverAdvance Agreement, § 4.5.1, item Second at 14.

- Third, the allowed fees and expenses of the Chapter 11 Trustee and all professionals retained by him shall be paid up to the aggregate amount of $584,000, plus certain fees and expenses associated with the negotiating, drafting and obtaining Bankruptcy Court approval of sales of assets. OverAdvance Agreement, § 4.3(a) at 11.

- Fourth, the allowed fees and expenses of the Chapter 11 professionals (counsel and other professionals hired by the Debtors and the Creditors' Committee) shall be paid to the total extent of $1,250,000; but if these do not aggregate $1,250,000, the balance shall become available to pay other allowed administrative expenses. Medium Term Financing Order, ¶ 7 at 5; and OverAdvance Agreement, § 4.5.1, item Fourth at 14–15.

- Fifth, the allowed fees and expenses of counsel to the Debtors and to the Creditors' Committee for transition costs shall be paid to the aggregate extent of $20,000. OverAdvance Agreement, §§ 4.7 and 4.5.1, item Fourth.

- Sixth, the Lender shall be paid on its secured claim to the extent of $6 million. OverAdvance Agreement, §§ 4.4(a) and 4.5.1, item Sixth.

- Seventh, of the next $8 million, 90 percent will be paid to the Lenders and 10 percent will be applied to allowed administrative expenses (other than administrative expenses owed to the Lenders). OverAdvance Agreement, §§ 4.4(a)(i) and 4.5.1, item Sixth.

- Eighth, of the remaining funds, the Lender will receive 60 percent and the administrative claimants will receive 40 percent of all distributions until allowed administrative expenses have been paid in full. OverAdvance Agreement, §§ 4.4(a)(ii) and 4.5.1, item Sixth.

- Ninth, after administrative expenses have been paid in full, the remaining funds will be paid to the Lender until its claim is paid in full. OverAdvance Agreement, §§ 4.4(a)(iii) and 4.5.1, item Sixth.

- Tenth, the remainder shall be paid to the Debtors' estates. OverAdvance Agreement, §§ 4.4(a)(iv) and 4.5.1, item Seventh.

However, the distributions in favor of administrative creditors in the Seventh and Eighth priorities above are subject to certain reductions, including reductions for and in the amount of any claims (outside of those contemplated in the above scheme) that are determined to be prior in right of payment to any portion of the Lender's claim. OverAdvance Agreement, §§ 4.4(b).

By their § 506(c) claim, the Employees seek payment from the proceeds of a sale of certain assets that are subject to the Lender's lien. The assets at issue comprised two divisions of the Debtors' business: the so-called wet waste business ("Wet Waste Assets") and the catalytic extraction processing business (the "CEP Assets"). On November 25, 1998, upon motion of the Chapter 11 Trustee and after an auction sale, the Court approved sale of (i) the Wet Waste Assets to ATG, Inc. for $10,500,000 cash and a $1,000,000 promissory note and (ii) the CEP Assets to Quantum Catalytics, LLC for $100,000 cash and an obligation of 5% of EBITDA of the CEP business for five years, with a minimum required payment of $800,000 per year the "CEP proceeds." The pro-

ceeds of these sales are the assets that the Employees now seek to charge under § 506(c).

The Employees make their § 506(c) claims under one or more employee retention plans that the Debtors established in the early months of 1998. Specifically, on February 23, 1998, the Debtors filed a Motion for Authority to Enter Employee Retention Plans. The motion sought authority to implement three severance/bonus plans: one for 24 executives (the "Executive Plan"), under which the chief executive officer and the chief operating officer would be paid severance benefits equal to 1.25 years of their respective salaries and all other covered executives would receive severance equal to 16 weeks' salary; a second plan for 36 key non-executive personnel (the "Technical Employee Plan"), which would provide fixed payments to covered employees in amounts not specified in the motion, but which plan the Debtor estimated would cost $284,000; and a third for "other" personnel (the "Ordinary Employee Plan"), which would provide covered employees with severance payments equal to two weeks' salary.[8]

On March 12, 1998, the Court entered an order allowing the motion as to the Ordinary Employee and Technical Employee Plans. The order specified that payments under the Technical Employee Plan would be (i) limited to the cost parameters described in the motion and (ii) payable either (a) in the event of elimination of the employee's job or (b) on the earlier of confirmation of a Chapter 11 plan or December 31, 1998.

On March 16, 1998, after the Debtors modified the Executive Plan to address concerns of the Creditors' Committee, the Court entered the Agreed–Upon Order Authorizing Debtors to Enter Into Executive Employee Retention Plan. This order allowed the motion as to the Executive

Plan, subject to certain clarifications and conditions, including that "severance pay to the chief executive officer and the chief operating officer shall not, in the aggregate, exceed $397,500, allocated between them as determined by MMT's board of directors."

On April 1, 1998, and pursuant to the authority granted in these orders, the Debtors delivered to each of the non-executive employees, including movant Garry Strand, a letter outlining the Court-approved retention plan. The parties have adduced no evidence as to which other employees received this letter. In relevant part, the letter at issue stated to each recipient:

- "[Y]ou have been selected to participate in the 1998 Key Employee Retention Program."

- "As a Key Employee, you would be eligible for a bonus equivalent to 8 weeks of salary (determined by your 4/1/98 annual base salary) which would be paid upon (a) MMT successfully emerging from Chapter 11 or (b) December 31, 1998, whichever comes first."

- "If the Company does not succeed with its restructuring plans during this time period and in the unlikely event that your job were eliminated, you would be guaranteed 8 weeks of severance (determined by your 4/1/98 annual base salary). A sufficient cash reserve has been set aside for this purpose, and the program has been approved by the Bankruptcy Court."

- "Your eligibility in the Program will cease should you voluntarily resign or if you are terminated by the company for serious cause, such as criminal or willful misconduct or gross dereliction of duty."

On April 17, 1998, the Debtors sent a second letter, known as the Variable In-

---

**8.** Aside from specifying that the chief operating officer (who was movant Charles Shaver) was an intended beneficiary of the executive plan, the motion did not specify which employees would be covered by each plan.

centive Compensation Plan (VICP) letter, to certain executives. One such letter was sent to movant Steven M. Brien. In relevant part, the letter sent to Mr. Brien stated:

Although no further staffing reductions are presently contemplated, it is appropriate to provide a measure of security in the event further reductions are required. Accordingly, you will be entitled to a severance benefit equivalent to 12 weeks' salary if your employment is terminated by the Company. This will increase to 16 weeks' salary on July 1, 1998. Please note that severance will *not* be paid if you voluntarily resign or are discharged for cause.

A second VICP letter was sent by F. Gordon Bitter, the Debtor's Chief Executive and Financial Officer, to Charles Shaver. In relevant part, it states:

Although no further staffing reductions are presently contemplated, it is appropriate to provide a measure of security in the event further reductions are required. As you know, your severance benefit will be decided by the Board of Directors; a benefit in the range of 9 to 12 months' salary should be expected. Please note that severance will *not* be paid if you voluntarily resign or are discharged for cause.

The Employees have adduced no evidence as to which other employees received a VICP letter or as to the specific severance terms offered in the VICP letters sent to other recipients.[9]

Insofar as the Debtor made promises of severance payments to the Employees, such promises were contained entirely in the letters the Debtors' issued on April 1 and 17, 1998. The Employees do not contend that the Debtors made promises of severance payments to any of them by any communication after the letters of April 17, 1998, and they have adduced no evidence of any later communication. Insofar as the Debtors' severance program was implemented with respect to the Employees at all, the Debtor undertook and implemented the program through the letters of April 1 and 17 only; upon transmittal of the letter of April 17, 1998, the program was as fully implemented as ever it would be.

The Chapter 11 Trustee terminated the employment of three Employees before September 29, 1998 (the date of the Interim OverAdvance Order): James Howie on August 28, 1998; Steven M. Brien on September 11, 1998; and David Hoey on September 18, 1998. The Trustee terminated the employment of William McGowan on October 16, 1998 and of Mark Wilkinson on December 4, 1998. The evidence is unclear as to the remaining Employees[10]; I have no evidence that others were released on or before September 29, 1998.

## 2. *Discussion*

The parties disagree as to whether, on the above facts, the Lender is entitled to judgment as a matter of law on its defense of waiver, but their points of disagreement are limited. The Lenders argue, and the Employees do not dispute, that by virtue of the Short and Medium Term Financing Orders, the Debtors–in–Possession waived all right that they, and the Trustee as their successor in interest, may otherwise have had to assert claims against the Lender

9. Therefore, aside from the representations in the above letters to Strand, Brien, and Shaver, the Court has no evidence of what promises the Debtors made to each of the Employees.

10. In his affidavit, Charles Shaver states that "the remaining Employees were retained until December 4, 1998." However, the term "Employees" is not defined in the affidavit, and it is not clear which (if any) of the movants are among the employees to whom he is referring, except that Howie, Brien, and Hoey are mentioned in the affidavit as having been terminated earlier. Moreover, in the Employees' responses to the Lender's Request for Admissions, the Plaintiffs admit that William McGowan was terminated on October 16, 1998, so the reliability of Shaver's affidavit is in some doubt, at least as to McGowan's termination date.

under § 506(c) on account of the Employees' severance claims. The Lenders also argue, and the Lenders do not dispute, that each Employee's severance claim arose before September 29, 1998, the date after which (pursuant to the Final OverAdvance Order) new claims against the Lender under § 506(c) would not be deemed waived. The Court agrees with this position: the Debtors became bound by their severance promises (at least to the extent that these had been authorized by the Court) virtually as soon as they were made, when the Employees relied upon those promises by continuing in the Debtors' employ. Each Employee's right to severance payments were of course subject to later forfeiture if the Employee voluntarily resigned or was discharged for cause,[11] but resignation was entirely in each Employee's control, and discharge for cause would at least require that the Employee be responsible for the cause. Therefore, the Lender is correct in stating that, as of September 29, 1998, the Debtor was bound by the severance promises, subject to the conditions subsequent of voluntary resignation or discharge for cause. Moreover, by September 29, the Trustee had already terminated the employment of three Employees: Steven Brien, James Howie, and David Hoey.

The parties disagree on two issues: whether the waiver is enforceable at all; and whether, if it is enforceable against the Trustee, it is also enforceable against claimants, such as the Employees, who were not party to the agreements in which the waivers were made. The Employees first argue that any waiver of rights under § 506(c) is contrary to public policy and therefore invalid and unenforceable. The Lenders respond that the waivers at issue were not simply a matter of contract; rather, they were approved by and embodied in orders of this Court and therefore, under principles of *res judicata,* are enforceable regardless of their compliance with public policy and with the Bankruptcy Code.

The Court agrees with the Lender on the enforceability of this waiver. The Court is not being asked here to enforce a debtor's prepetition contractual waiver of rights under § 506(c). Nor is it being asked to approve a postpetition financing agreement containing a waiver of the Trustee's rights under § 506(c). Here, the Court *has* approved such a waiver and made it a final order of the Court. The issue is whether the order is now enforceable. On this the Lender correctly states the law: where the waiver is approved by and expressly embodied in an order of the Bankruptcy Court, then, by the principle of *res judicata,* it is enforceable—at least against the Debtors in Possession, the Trustee, and those served with the motions to approve the agreements containing the waivers—regardless of how it squares with public policy, with the Bankruptcy Code, and with the interests of the estate. *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938) (bankruptcy court decision that addressed and rejected respondent's challenge to court's jurisdiction was not subject to collateral attack by the respondent, even if wrong on the subject-matter jurisdiction issue); *Monarch Life Insurance Co. v. Ropes & Gray,* 65 F.3d 973 (1st Cir.1995) (appellant was collaterally estopped by bankruptcy court's plan confirmation order, which permanently enjoined suits against third parties, from challenging court's jurisdiction to enter the permanent injunction). Therefore, the waiver is enforceable, at least against the Trustee.[12]

11. It is clear from the severance-plan letters in evidence that the Employees were obligated to remain in the Debtors' employ for a time to earn their benefits, but the letters do not specify how long the Employees were obligated to remain with the Debtor in order to earn their benefits. For purposes of this motion, I assume that the Employees were obligated to remain until a date after September 29, 1998.

12. The cases on which the Employees rely for the proposition that § 506(c) waivers are unenforceable either address a distinct issue or

■ This raises the second issue: whether the waivers by the Trustee and Debtors–in–Possession can bind claimants under § 506(c) who were not parties to the agreements in which the waivers were made. Here, the Employees make two distinct arguments: one based on the language of the applicable orders and agreements, and the other on public policy.

The Employees first argue that the language of the applicable orders and agreements waives only the Trustee's rights. They point out that the waiver language in the orders and agreements does not mention or address claims by third-party claimants, only claims of the Debtors–in–Possession and the Trustee. The Employees argue that when this fact is viewed in light of *Parque Forestal's* holding[13] that third parties have standing in some circumstances to bring direct claims against secured creditors under § 506(c), the orders and waivers cannot fairly be construed to apply to third-party claimants.

The Lender responds that the third-party claimants are bound despite any independent reference to them in the language of the orders and agreements. Re-

lying on *Parque Forestal* itself, the Lender takes the position that creditor standing under § 506(c) is derivative of the trustee's statutory right of recovery and is exercisable only when the trustee has failed to exercise his or her rights. It follows, argues the Lender, that when a debtor in possession or trustee has waived its rights under § 506(c) for valuable consideration, the waiver will bind creditors who later seek to "stand in the trustee's shoes." *Parque Forestal,* 949 F.2d at 511.

■ The Court agrees with the Lender for two reasons: the statutory language and the administrative policy it reflects. The express language of § 506(c)[14] gives the power to bring a claim thereunder to "the trustee."[15] This language does not prevent a third-party claimant from bringing a direct claim under § 506(c) against the secured creditor in appropriate circumstances, *Parque Forestal,* 949 F.2d at 511–512, but it does mean that the third-party's standing is derivative of the trustee's standing. As the Lender has highlighted, the First Circuit itself characterized the cases it followed in *Parque Forestal* as

fail to address issues of *res judicata.* In *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr.D.N.H.1993), the Bankruptcy Court declined to approve a § 506(c) waiver in a cash collateral stipulation; it did not address an order already entered. In *In re Willingham Inv., Inc.*, 203 B.R. 75, 78 (Bankr. M.D.Tenn.1996), the court declined to include a § 506(c) waiver in an order approving use of cash collateral. In *Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.)*, 150 F.3d 868, 872 (8th Cir. 1998), now vacated on other grounds, the court held that a provision in a postpetition financing order that immunized the secured creditor from 506(c) charges was unenforceable, but without addressing issues of *res judicata.* And in *McAlpine v. Comerica Bank–Detroit (In re Brown Bros., Inc.)*, 136 B.R. 470 (W.D.Mich.1991), the court ruled that a provision barring claims under § 506(c) in an order approving the use of cash collateral was unenforceable, but without addressing issues of *res judicata.*

**13.** *In re Parque Forestal, Inc.*, 949 F.2d 504, 511–512 (1st Cir.1991).

**14.** Section 506(c) of the Bankruptcy Code states:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
>
> 11 U.S.C. § 506(c).

**15.** By operation of § 1107(a), the term "trustee" in § 506(c) includes a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1107(a). Section 1107(a) states:

> Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all of the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

permitting recovery by third parties "who equitably come to stand in the trustee's shoes." *Id.* The statutory concentration of authority under § 506(c) in the trustee permits the trustee to administer his or her rights thereunder for the benefit of the estate without interference from third parties. Accordingly, *Parque Forestal* permitted a third-party claimant to prosecute a claim under § 506(c) only because the debtor in possession had no interest in or incentive to prosecute the claim. *Parque Forestal,* 949 F.2d at 511–512; *In re McKeesport Steel Castings, Co.,* 799 F.2d 91, 93–94 (3rd Cir.1986) (third-party had standing where debtor in possession had no reason to make a claim under § 506(c)). Because the claimant's standing under § 506(c) is derived from and secondary to the trustee's, the claimant cannot exercise its standing inconsistently with the trustee's disposition of his rights under that section. Unlike *Parque Forestal,* where the debtor-in-possession had no incentive to exercise his rights under § 506(c), the Trustee and Debtors–in–Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estate (including a substantial carve-out for the benefit of administrative creditors). If the standing of third-party claimants were deemed independent of the trustee's, a trustee's ability to administer his or her rights under § 506(c) would be substantially undermined. For these reasons, I conclude that the Employees' standing under § 506(c) is derivative of the Trustee's, and therefore that the waiver can and does bind the Employees without any independent reference to them in the agreements and orders.

■ The Employees also argue that as a matter of public policy, the prior waivers should not bind them because they were not parties to the waiver agreements. (The Employees do not elaborate on this argument.) The Court disagrees. It is true that the Employees were not party to the waiver agreements. However, the orders that approved the waivers had already been entered when the severance plans were approved and then implemented. Consequently, (1) the severance claims at issue were not in existence when the waivers were made, so the waivers did not affect any then-existing rights of the Employees; and (2) the waivers, which were embodied in the orders approving the Short and Medium Term Financing Agreements, were a matter of public record when the Employees commenced working in reliance on the Debtors' severance promises, so the Employees cannot contend that relied upon the severance promises without at least constructive notice of the waiver. Therefore, I find no policy reasons for deeming the waivers unenforceable against the Employees.

For these reasons, the Court concludes that the Employees are bound by the waivers and therefore that the Lender is entitled to judgment as a matter of law on the Employees' claims under § 506(c).

**c. *Administrative Claim of Charles Shaver***

■ The Lender also seeks summary judgment as to the administrative claim of Employee Charles Shaver, the President and Chief Operating Officer of Debtor Molten Metal Technology, Inc., who asserts an administrative claim for severance benefits of $250,000.[16] Shaver bears the burden of proof on his administrative claim. *In re Hemingway Transport, Inc.,* 954 F.2d 1, 5 (1st Cir.1992) ("the burden of proving entitlement to priority payment as an administrative expense ... rests with the party requesting it"). The Lender argues that it is entitled to summary judgment on Shaver's claim because there is no

---

**16.** The Lender has standing to oppose administrative claims because, under the carve-out for administrative claims contained in the ap-

proved OverAdvance Agreement, administrative claims have priority over at least a portion of the Lender's secured claim.

evidence that the board of directors of Debtor Molten Metal Technology, Inc. ever made an award of severance benefits to Shaver or allocated severance amounts between Shaver and the Debtor's CEO, F. Gordon Bitter.[17] Shaver responds by adducing the affidavit of F. Gordon Bitter, wherein Bitter refers to "$250,000 that the board informally allocated to Charlie Shaver."[18] This averment, Shaver contends, is sufficient evidence of the necessary board action to establish a genuine issue of material fact. The Lender responds that Bitter's averment is not admissible, and therefore does not establish a genuine issue of material fact, because[19] (1) Bitter does not state that he has personal knowledge of the Board's action, (2) the meaning of "informal" in the averment is entirely unclear, and (3) the averment that the board acted was undetailed and conclusory.[20]

Federal Rule of Civil Procedure 56(e) requires that

> [s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show

affirmatively that the affiant is competent to testify to the matters stated therein.

The Court must exclude Bitter's averment because, as the Lender correctly contends, Bitter does not state affirmatively that he has personal knowledge of the board's action, his affidavit supplies no information as to the meaning of "informally," and, insofar as the averment is offered as proof that the allocation was a binding and effective act of the board of directors, it is entirely undetailed and conclusory. Bitter's affidavit does not contain, and no Employee has submitted as evidence, a copy of the minutes of any board meeting or board vote on this issue.

Nothing in Bitter's affidavit establishes that he has any personal knowledge of the board's informal allocation. Shaver responds that Bitter was a member of the board of directors and therefore was privy to the actions taken by the board, but this response completely fails to establish that Bitter had personal knowledge: I have no evidence that Bitter was a member of the board when it made the alleged allocation; but even if he were, it would not necessari-

17. An allocation was required by the Agreed–Upon Order Authorizing Debtors to Enter Into Executive Employee Retention Plan, which provided that "severance pay to the chief executive officer and the chief operating officer shall not, in the aggregate, exceed $397,500, allocated between them as determined by MMT's board of directors." It was also contemplated by the VICP letter sent by F. Gordon Bitter to Charles Shaver, which stated: "As you know, your severance benefit will be decided by the Board of Directors; a benefit in the range of 9 to 12 months' salary should be expected." Shaver does not deny that, in order to establish his administrative claim, he must demonstrate that the board of directors made a valid allocation of some portion of the $397,500 between himself and Bitter, the Debtor's CEO. Without an allocation, the Debtor cannot be deemed to have made a promise of severance benefits to Shaver or otherwise to have implemented a severance program as to him.

18. This averment appears in ¶ 15 of Bitter's affidavit, which, in its entirety, states: "On May 10, 1999, my attorney filed on my behalf an Administrative Proof of Claim asserting my right to the payment of severance in the amount of $147,500. This amount equals the court-approved $397,500 allotment for myself and Charlie Shaver, less the $250,000 that the Board of Directors informally allocated to Charlie Shaver."

19. Shaver has moved to amend the admissions on this issue, and the Lender has opposed the motion.

20. As further cause for finding the averment inadmissible, the Lender also contends that (1) that it contradicts the Plaintiffs' earlier admission that the Board never made the necessary allocation and (2) that if the board took any action at all, it most likely did so only after appointment of the Chapter 11 Trustee, which appointment had the effect of divesting the board of directors of any authority to take action on behalf of the Debtors. I need not address these further arguments. Even if I were to resolve them in Shaver's favor, it would not save his administrative claim from summary disposition.

ly follow that he had personal knowledge of the action. Therefore, Bitter's averment is inadmissible for lack of an affirmative showing that Bitter has personal knowledge of the alleged informal allocation.

Moreover, the meaning of "informal" in Bitter's affidavit is crucial to Shaver's claim, but Bitter does not define the term, and Shaver adduces no other evidence on the issue. The burden is on Shaver to establish the validity of his claim and, as part of the burden, to show that the action on his claim was a valid act of the board. Bitter's reference to monies "informally allocated" stands alone, entirely without explanation and supporting facts, and as such is inherently ambiguous and opaque. I find it is not probative evidence that the MMT board of directors ever voted to allocate the severance pay between the two officers. Bitter's statement would be excluded as irrelevant (FRE 401), or at least as tending more to confuse than to elucidate (FRE 403). As a matter of law, the ambiguity of the averment prohibits a reasonable finder of fact from finding that Shaver had sustained his burden of demonstrating a valid allocation by the board.

For these reasons, I conclude that, as to an essential element of Shaver's administrative claim, there is no genuine issue of material fact and that, as a matter of law, the Lender is entitled to judgment denying Shaver's administrative claim.

### ORDER

For the reasons set forth above, the Court hereby

1. ALLOWS the Motion of MMT Recovery LLC for Summary Judgment as to the Employees' Claims under § 506(c) and as to the administrative claim of Charles Shaver;

2. ALLOWS the Motion of MMT Recovery LLC to Strike the Employees' Cross–Motion for Summary Judgment is hereby ALLOWED; and

3. DENIES the Employees' Cross–Motion for Summary Judgment.

The Court will not *sua sponte* enter a separate and final order at this time on the adjudicated portions of the Employees' Motion for Payment of Priority Basis of Administrative Expenses because some claims in the motion have not yet been adjudicated; however, any party may for cause move under Rule 54(b) for entry of a separate final order on the claims adjudicated by this order.